## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cr-20315-SHM-tmp |
| | ) | |
| TERRANCE FREEMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Before the court by order of reference is defendant Terrance Freeman's Motion to Suppress, filed on July 8, 2015. (ECF No. 44.)  Freeman filed an Amended Motion to Suppress on July 13 and filed a Second Motion to Suppress on August 7.  (ECF Nos. 50 & 55.)  The government responded in opposition to Freeman's motions on August 14.  (ECF No. 57.)  On August 20, 2015, the court held a suppression hearing.[1]

For the reasons below, it is recommended that the motion to suppress be denied.

### I.  PROPOSED FINDINGS OF FACT

### A.  Search Warrant

---

[1]The suppression hearing was originally scheduled for August 7, 2015, but was continued until August 20 upon Freeman's motion to allow him to late file a second amended motion to suppress.

On December 16, 2014, Freeman was indicted by a federal grand jury on charges of conspiracy to distribute hydrocodone, possession of a firearm by a convicted felon, and possession of a firearm in furtherance of a drug trafficking crime. This indictment stems from the execution of several search warrants, including one executed at [xxxx] Tranquil Creek, Memphis, Tennessee ("Tranquil Creek") on April 16, 2014, and Freeman's subsequent arrest on November 20, 2014. The search warrant in question was issued by Chief United States Magistrate Judge Diane Vescovo on April 4, 2014. Federal Bureau of Investigation ("FBI") Special Agent Leonard Jones prepared a forty-two page affidavit supporting the search warrant.[2] The affidavit provided, in pertinent part, as follows:

In 2012, the FBI Safe Streets Task Force began a three-year investigation concerning the distribution of narcotics and commission of violent crimes by members of a Memphis-based neighborhood gang known as the "Memphis Mob." The investigation originally focused on the gang's leader, Kevin Bridgeforth, who was suspected of acquiring and distributing kilogram quantities of cocaine in Memphis. As part of the investigation, Bridgeforth's cell phone conversations were monitored from January 2013 to March 2013. During this time, investigators

---

[2]The search warrant affidavit was originally filed under seal. However, at the suppression hearing, the government stated that the affidavit no longer needs to be under seal.

intercepted calls between Bridgeforth and Brian Murray discussing prices of cocaine and distribution efforts. Because of these calls, as well as information obtained from proffer interviews and cooperating sources, the investigators assigned to the FBI Safe Streets Task Force began to focus their investigation on Murray.

After Bridgeforth was arrested, Murray moved up within the Memphis Mob and began controlling, directing, and managing the drug trafficking activities of at least four individuals, including Freeman. During the FBI's investigation, Murray transferred over $600,000 in narcotics proceeds between Memphis, Tennessee, and Detroit, Michigan, by using a Bank of America checking account. Additionally, within the course of the investigation, Murray used at least six different cellular phones and utilized at least two different "stash houses" to distribute cocaine, cocaine base, prescription pills, and Promethazine.

Murray's cell phone activity was monitored from October 15, 2013 through December 6, 2013. During this time, telephone conversations between Murray and Freeman revealed that Murray frequently provided Freeman with distribution quantities of narcotics, and that Freeman distributed those narcotics to other individuals. In total, the investigators intercepted eighty-five (85) telephone calls between Murray and Freeman involving

narcotics-related conversations.  For example, on October 22, 2013, at 7:22 p.m., the following conversation was intercepted:

```
Freeman:  Hello?
Murray:   How many had you wanted?
Freeman:  Uh, let me see.  Bring me 50 of them.
Murray:   Alright.
Freeman:  Alright.
```

These ongoing communications further revealed that Murray would meet Freeman at Tranquil Creek to deliver narcotics and that he would sometimes place narcotics in the mailbox when Freeman was not at home.  For example, at 8:18 p.m. on October 22, 2013, less than an hour after the conversation referenced above took place, investigators intercepted this conversation:

```
Freeman:  Hello?
Murray:   Where you at []?
Freeman:  I'm at the house.  Where you at?
Murray:   Outside.
Freeman:  Alright.
```

Furthermore, on March 29, 2014, at 12:01 a.m., Murray's cell phone registered a GPS location at Tranquil Creek, and at 12:17 a.m. registered another GPS location at a known stash house. This information led investigators to conduct surveillance of Freeman, which resulted in the identification of Tranquil Creek as Freeman's residence.

Based on this information, the government requested a search warrant for Tranquil Creek to search for and seize documents relating to Freeman's suspected narcotics activity.

As mentioned above, the search warrant was issued on April 4, 2014.

**B.    Execution of the Search Warrant**

On April 16, 2014, officers executed the search warrant at Tranquil Creek.  During the search, officers recovered a fully loaded Glock 9 mm caliber semi-automatic pistol, $8,000 in suspected drug proceeds, nine hydrocodone pills, and $480 from Freeman's wallet.  At the suppression hearing, the court heard testimony regarding the manner in which the search warrant on Tranquil Creek was executed.  The only witness the government called to testify on this issue was FBI Special Agent Paul Simpson, who has worked for the FBI since 2000 and has been a senior SWAT team leader for approximately three years.  Special Agent Simpson was present when the search warrant at issue was executed.  Special Agent Simpson testified that his team knocked and announced their presence at the front door of Tranquil Creek, and that members of his team banged on the front door and waited "a reasonable amount of time" before attempting to breach the front door.  Special Agent Simpson's team was not able to breach the front door immediately, so he signaled members of his team who were positioned at the back door to breach the back door.  Special Agent Simpson testified that "at least 30 seconds or more" passed from the time that his team knocked and

announced their presence at the front door until entry was made through the back door.

Freeman testified on his own behalf regarding his connection to Tranquil Creek. He stated that Tranquil Creek was not his home, but rather was the residence of Taniera Carlock, the mother of his four children. Freeman testified that he would go to the Tranquil Creek residence to babysit his two daughters Monday through Friday each week from 6:00 a.m. until 4:00 p.m., while his two sons were at school and Carlock was at work. He further stated that Carlock always left the garage door open for him so he could gain access to the house and that he kept some personal items there.[3]

With regard to the manner in which the search warrant was executed, Freeman testified to a starkly different version of events. Freeman testified that he did not hear a knock and announce from the SWAT team either at the front or back door. He further testified that the first time he realized the officers were at the home was when he heard a battering ram hitting the back door, followed by the police throwing a "flashbang" device into the home.[4] Additionally, Freeman stated

---

[3]The government did not present any countervailing evidence regarding Freeman's connection with Tranquil Creek.

[4]Freeman also called as a witness Germantown Police Officer Robert Bertling, who was assigned to an FBI task force and who was present during the search of Tranquil Creek. Officer

that his children were present during the search, that officers made him stand outside in his underwear, and that officers took pictures of him, Carlock, and their children.

The court, having considered the testimony of the witnesses and their demeanor as they testified, finds the testimony of Special Agent Simpson to be credible and the testimony of Freeman regarding the execution of the search warrant to be not credible. Therefore, the court adopts the government's version of the events.

## C. Motion to Suppress

In his motion to suppress, Freeman argues that the search warrant affidavit failed to establish probable cause because the information relied on was stale, and because the affidavit did not establish a sufficient nexus between the phone calls between Murray and Freeman intercepted in October 2013 with the GPS coordinates placing Murray at Tranquil Creek in March 2014. Additionally, Freeman argues that the good faith exception established in United States v. Leon, 468 U.S. 897 (1984), should not apply. Freeman also argues that the search warrant affidavit contains false or misleading information. The statements in the affidavit that Freeman contends are false or misleading are as follows:

---

Bertling testified generally about the execution of the search warrant, but his testimony was not particularly pertinent to the issues raised in the motion.

> [O]n March 29, 2014, at 12:01 A.M., Murray's cellular
> telephone registered a GPS location at Terrance
> Freeman's house, located at [xxxx] Tranquil Creek,
> Memphis, TN. At 12:17 A.M., Murray's cellular
> telephone registered a GPS location on [xxxx]
> Saddleback Circle. Therefore, based on your affiant's
> training and experience, and familiarity of this case
> and the manner in which Murray conducts narcotics
> transactions, your affiant believes that Murray met
> with Terrance Freeman at [xxxx] Tranquil Creek, and
> then drove to his "stash house" on [xxxx] Saddleback
> Circle after conducting a narcotics transaction with
> Freeman.

In support of this argument, Freeman called as a witness Chris Miller, the computer systems administrator at the Federal Public Defender's Office. Miller was asked on direct examination: ". . . from that GPS information given from the cell phone company, would you be able to tell exactly what address that cell phone was in at the time?" Miller answered: "Not exactly. You could come close." Miller further testified that based on the GPS information received from AT&T regarding the location of Murray's phone at 12:01 a.m. on March 29, 2014, there was a 36 meter "radius of uncertainty" from the central "ping" point, or a 235 foot circular area, in which Murray's cell phone actually could have been located. Therefore, Freeman contends that Special Agent Jones's statement that Murray's cell phone registered a GPS location at Tranquil Creek is inaccurate and misleading. Lastly, although not specifically mentioned in his motion, Freeman argues that this allegedly false or misleading

information entitles him to a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Expectation of Privacy

Initially, the government argues that Freeman does not have grounds to object to the search of Tranquil Creek because the residence actually belongs to Taniera Carlock, the mother of his four children.  The government urges that since Freeman was only a visitor at Carlock's home, he had no reasonable expectation of privacy in the residence.  A defendant who seeks to suppress evidence "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . ."  <u>United States v. Noble</u>, 762 F.3d 509, 526 (6th Cir. 2014) (quoting <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998)).  To meet this requirement, "the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable."  <u>United States v. Washington</u>, 573 F.3d 279, 282-83 (6th Cir. 2009) (citing <u>United States v. Pollard</u>, 215 F.3d 643, 647 (6th Cir. 2000)).  "An expectation is objectively reasonable only when it is one that society is prepared to recognize as legitimate."  <u>Id.</u> (internal quotation marks omitted).

"A person may acquire a reasonable expectation of privacy in property in which he has neither ownership nor any other

legal interest." Id. at 283 n.1 (citing Minnesota v. Olson, 495
U.S. 91, 96-97 (1990) (holding that a person's "status as an
overnight guest is alone enough to show that he had an
expectation of privacy in the home that society is prepared to
recognize as reasonable")). In certain cases, the Sixth Circuit
has even extended the ability to challenge a search to non-
overnight guests who were allowed to keep personal items in the
residence searched. Id.; see also United States v. Waller, 426
F.3d 838, 844 (6th Cir. 2005) (holding that a person who was
never an overnight guest could challenge the search of his
luggage bag in a friend's apartment where he showered, changed
clothes, and kept some personal belongings).

Although Freeman did not live with Carlock or stay
overnight at her house, he testified that he went to her house
Monday through Friday each week to babysit their two daughters
from around six in the morning until four in the afternoon while
their two sons were at school.[5] Additionally, Freeman testified
that Carlock would always leave the garage door open for him so
that he could enter the home on his own, and that he kept some
clothing items at the house. Based on Freeman's testimony, the
court finds that he had a subjective expectation of privacy in

_____

[5]In his first motion to suppress, Freeman claimed that he often
stayed overnight at Carlock's residence. (ECF No. 44.)
However, when he testified at the suppression hearing, Freeman
stated that he did not stay overnight at Carlock's house.

the Tranquil Creek residence.  The court also finds that his expectation of privacy was objectively reasonable under the circumstances.  As such, Freeman has the authority to challenge the search of Tranquil Creek.

## B.  Motion for a **Franks** Hearing

In Franks, the Supreme Court held that a search based on a warrant that contains deliberately or recklessly false allegations is invalid unless the remaining portions of the affidavit provide probable cause.  "A Franks hearing is an evidentiary hearing during which defendants are allowed to present evidence concerning the veracity of the challenged statements in the search warrant affidavit."  United States v. Kelley, 596 F. Supp. 2d 1132, 1149 (E.D. Tenn. 2009) (citing United States v. Keszthelyi, 308 F.3d 557, 566–68 (6th Cir. 2002)); see also United States v. Brooks, No. 11-cr-20137Ml/P, 2011 WL 7081072, at *3 (W.D. Tenn. Dec. 8, 2011) ("The purpose of a Franks hearing is to allow the defendant to challenge the truthfulness of statements in an affidavit in order to challenge the legality of a search warrant issued on the basis of the affidavit.") (internal quotation marks and citation omitted). "To obtain a Franks hearing, the movant must provide a substantial preliminary showing that a false statement was made either knowingly or intentionally, or with reckless disregard for the truth.  The movant must also show that the allegedly

false statements were necessary for the magistrate's determination of probable cause." United States v. Mastromatteo, 538 F.3d 535, 545 (6th Cir. 2008).

The court finds that Freeman has not made a substantial preliminary showing that a false statement was even made, much less one that was made knowingly or intentionally, or with reckless disregard for the truth. Freeman argues that the statement, "[O]n March 29, at 12:01 A.M., Murray's cellular telephone registered a GPS location at Terrance Freeman's house, located at [xxxx] Tranquil Creek," was inaccurate because there was a 36 meter "radius of uncertainty" from the central "ping" point, or a 235 foot circular area, in which Murray's cell phone actually could have been located. However, Freeman's own exhibit presented at the suppression hearing demonstrates that when the relevant AT&T coordinates of Murray's location on the date and time in question are typed into Google Earth, the GPS coordinates fall squarely on the front yard of Tranquil Creek. (Ex. 2.) Freeman argued at the suppression hearing that this does not demonstrate that Murray was located inside Tranquil Creek at that time. However, Special Agent Jones's affidavit does not state that Murray was *inside* of the house at Tranquil Creek on the date in question, but rather that he was *at* Tranquil Creek.

Not only was Special Agent Jones's statement literally true, but it also was not misleading.  In his affidavit, Special Agent Jones stated:

> [O]n March 29, 2014, at 12:01 A.M., Murray's cellular telephone registered a GPS location at Terrance Freeman's house, located at [xxxx] Tranquil Creek, Memphis, TN.  At 12:17 A.M., Murray's cellular telephone registered a GPS location on [xxxx] Saddleback Circle.  Therefore, based on your affiant's training and experience, and familiarity of this case and the manner in which Murray conducts narcotics transactions, your affiant believes that Murray met with Terrance Freeman at [xxxx] Tranquil Creek, and then drove to his "stash house" on [xxxx] Saddleback Circle after conducting a narcotics transaction with Freeman.

These statements indicate that Special Agent Jones reasonably deduced from the GPS information that Murray met with Freeman at Tranquil Creek, not that Special Agent Jones knew with unwavering certainty that the meeting occurred.  Therefore, the court finds that Special Agent Jones's statements regarding the GPS location of Murray at 12:01 a.m. on March 29, 2014, were neither false nor misleading.  It is recommended that Freeman's motion for a <u>Franks</u> hearing be denied.

**C.  Motion to Suppress**

1.  <u>Probable Cause</u>

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const.

amend. IV.  To determine if probable cause exists, the task of the issuing judicial officer is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Franklin, No. 14-5093, 2015 WL 4590812, at *6 (6th Cir. July 31, 2015).  "The standard of review for the sufficiency of an affidavit 'is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'"  United States v. Greene, 250 F.3d 471, 478 (6th Cir. 2001) (quoting United States v. Davidson, 936 F.2d 856, 859 (6th Cir. 1991)); see also United States v. Ugochukwu, 538 F. App'x 674, 678 (6th Cir. 2013).  Search warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny.  United States v. Baechtle, No. 2:13-cr-20054-SHM, 2015 WL 893348, at *7 (W.D. Tenn. Mar. 2, 2015) (citing United States v. Johnson, 351 F.3d 254, 258 (6th Cir. 2003)).  Review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit.  United States v. Brooks, 594 F.3d 488, 492 (6th Cir. 2010).

Freeman argues that the affidavit supporting the search warrant failed to establish probable cause because the calls intercepted between Freeman and Murray in October 2013 were stale when the warrant was issued in April 2014. Additionally, Freeman argues that even if the communications from October 2013 were not stale, the affidavit did not establish an adequate relationship between the communications between Murray and Freeman intercepted in October 2013 with the GPS coordinates placing Murray at Tranquil Creek in March 2014 to support a finding of probable cause.

When discussing whether information in a search warrant affidavit is stale, the Sixth Circuit has explained that "the critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [evidence] would still be found at [the location of the search]." United States v. Abboud, 438 F.3d 554, 572 (6th Cir. 2006) (alteration in original) (quoting United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998)). "A staleness test is not designed to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." United States v. Holland, No. 02-20356BV, 2003 WL 21946598, at *6 (W.D. Tenn. July 23, 2003) (quoting Spikes, 158 F.3d at 923) (internal quotation marks omitted). Rather, the "court should consider the defendant's

course of conduct, the nature and duration of the offense, the nature of the relevant evidence, and any corroboration of the information." United States v. Jackson, 470 F.3d 299, 308 (6th Cir. 2006) (citing United States v. Gardiner, 463 F.3d 445, 471 (6th Cir. 2006)). Generally, evidence of ongoing criminal activity will defeat a claim of staleness. Greene, 250 F.3d at 481 (citing United States v. Canan, 48 F.3d 954, 958 (6th Cir. 1998)).

Contrary to Freeman's allegation in his motion that the phone calls supporting probable cause occurred only in October 2013, the phone calls between Murray and Freeman supporting the affidavit actually extended until December 6, 2013. In fact, eight-five (85) conversations between Murray and Freeman relating to narcotics were intercepted by investigators from October 15, 2013 through December 6, 2013. The information obtained by investigators from these phone calls regarding drug-related activity was refreshed by the suspected criminal conduct of Murray and Freeman on March 29, 2014, less than four months later. Based on the ongoing nature of Murray and Freeman's drug activity, combined with the corroborating evidence of suspected drug activity on March 29, 2014, the court finds that the information contained in the affidavit was not stale. See id. (affirming district court's finding that information concerning

drug trafficking activity obtained twenty-three months before a search was executed based on the information was not stale).

The court also finds that the affidavit establishes a sufficient nexus connecting the communications between Murray and Freeman intercepted from October to December 2013 to the GPS coordinates placing Murray at Tranquil Creek in March 2014. "[T]o establish probable cause to support a search warrant, there must be some nexus between the suspected illegal activity and the property to be searched." United States v. Kinison, 710 F.3d 678, 683 (6th Cir. 2013) (citing United States v. McPhearson, 469 F.3d 518, 524 (6th Cir. 2006)). Here, the affidavit states that investigators intercepted conversations between Murray and Freeman revealing that Murray would meet Freeman at Tranquil Creek to exchange narcotics. On March 29, 2014, GPS coordinates placed Murray at Tranquil Creek at 12:01 a.m. and at a known stash house at 12:17 a.m. the same day. Based on the totality of the circumstances, the court finds that the search warrant was supported by probable cause.

### 2. Good-Faith Exception

Even assuming, *arguendo*, that the affidavit lacked probable cause, the good-faith exception to the exclusionary rule would apply and result in a denial of the motion to suppress. As explained by the Sixth Circuit:

If an affidavit lacks probable cause, "[t]he Supreme Court has recognized an exception to the exclusionary rule where 'the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate . . . .'" United States v. Watson, 498 F.3d 429, 431 (6th Cir. 2007) (quoting Massachusetts v. Sheppard, 468 U.S. 981, 987–88, 104 S. Ct. 3424, 82 L.Ed.2d 737 (1984)). This is known as the good-faith exception. Id. In determining whether an officer had good faith, this Court looks to whether the officer would have known that the search was illegal, despite the magistrate's authorization. United States v. McPhearson, 469 F.3d 518, 525 (6th Cir. 2006) (quoting United States v. Leon, 468 U.S. 897, 922–23, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984)). However, the good-faith exception does not apply to affidavits so lacking indicia of probable cause that a belief in the existence of probable cause would be objectively unreasonable. United States v. Laughton, 409 F.3d 744, 748 (6th Cir. 2005) (citing Leon, 468 U.S. at 914–23, 104 S. Ct. 3405). An affidavit lacks the requisite indicia of probable cause if it is a "bare-bones" affidavit. See Laughton, 409 F.3d at 748. The inquiry into whether an affidavit is so bare bones as to preclude application of the good-faith exception is a less demanding inquiry than the one involved in determining whether an affidavit provides a substantial basis for the magistrate's conclusion of probable cause. Id. at 748–49. The bare-bones inquiry requires examination of the affidavit for particularized facts that indicate veracity, reliability, and basis of knowledge and that go beyond bare conclusions and suppositions. Id. at 748.

United States v. Rose, 714 F.3d 362, 367 (6th Cir. 2013). The Leon good-faith exception will also not apply when the issuing judge was misled by false information; the issuing judge abandoned his or her neutral judicial role; or the warrant was so facially deficient that it could not reasonably be presumed

valid.  United States v. Hodson, 543 F.3d 286, 292 (6th Cir. 2008).

The court concludes it was reasonable for Special Agent Simpson and SWAT team officers to rely on the issuing judge's determination of probable cause.  As discussed above, the affidavit supporting the search warrant contains no false information.  There is no evidence that the issuing judge abandoned her neutral and detached role in signing the search warrant.  Finally, Special Agent Jones's affidavit was not bare bones or facially deficient – in fact, it provided more than sufficient details regarding ongoing narcotics-related communications between Murray and Freeman from October 2013 through December 2013 and the corroborating GPS location of Murray's cell phone on March 29, 2014.  Therefore, even if the court were to find that the search warrant lacked probable cause (and the court makes no such finding), it is submitted that the good-faith exception would apply.  See, e.g., United States v. Neal, 577 F. App'x 434, 449-50 (6th Cir. 2014) (concluding that the good-faith exception should apply when defendant had failed to make even a preliminary showing that false statements had been included in the affidavit; no evidence had been presented as to the issuing judge's neutrality; officer "did corroborate enough specific facts . . . to establish a minimal nexus between the place to be searched and the potential for criminal

activity"; and the warrant was not so facially deficient that the executing officers could not reasonably presume it to be valid).

### 3. Knock and Announce

Finally, Freeman argues that the evidence should be suppressed because the officers violated the knock and announce rule. As the Eastern District of Tennessee has explained:

> The knock and announce rule "forms a part of the reasonableness inquiry under the Fourth Amendment." United States v. Pinson, 321 F.3d 558, 566 6th Cir. 2003) (citing Wilson v. Arkansas, 514 U.S. 927, 929 (1995)). Failure to knock and announce prior to forcibly entering a location to execute a search warrant, absent exigent circumstances, is unreasonable under the Fourth Amendment. Id. (citing United States v. Dice, 200 F.3d 978, 983 (6th Cir.2000)). Nonetheless, the Supreme Court has stated that the reasonableness inquiry is not dictated by bright-line rules but is fact-specific, to be determined on a case-by-case basis. Id. (citing Ohio v. Robinette, 519 U.S. 33, 39 (1996)). Therefore, the Court must look to the totality of the circumstances when determining whether the officers entry into the residence . . . was reasonable. Id. (citing United States v. Banks, 540 U.S. 31 (2003)).

United States v. Truss, No. 3:05-CR-146, 2006 WL 1408405, at *11 (E.D. Tenn. May 19, 2006). Special Agent Simpson and his team of officers waited at least thirty seconds after knocking and announcing their presence before forcing entry into Tranquil Creek. Under these facts, the court finds that the officers did not violate the knock and announce rule. Moreover, even if the officers had violated the knock and announce rule when executing

the search warrant, such a violation would not provide a basis for suppression of the evidence.  See Hudson v. Michigan, 547 U.S. 586, 594 (2006); United States v. Roberge, 565 F.3d 1005, 1010 (6th Cir. 2009); United States v. Perkins, 242 F. App'x 338, 341 (6th Cir. 2007).  Therefore, it is recommended that Freeman's motion to suppress based on a violation of the knock and announce requirement be denied.[6]

### III.  RECOMMENDATION

For the above reasons, the court recommends that Freeman's motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

September 4, 2015
Date

---

[6]Freeman also complains of alleged mistreatment by the officers who executed the search warrant.  Specifically, he complains that his children were present during the search and that the officers made him stand outside in his underwear and took pictures of him, Carlock, and their children.  However, as Officer Bertling testified, it is standard procedure for officers to take photographs of occupants in the residence when executing a search warrant.  Moreover, as Special Agent Simpson testified, the officers were not aware that children were present until they actually entered the home.  In any event, there was no evidence that any of the occupants were harmed in any way during the execution of the search warrant.  None of Freeman's allegations, either separately or in the aggregate, provide any basis for granting his motion to suppress.

**NOTICE**

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN
FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT.
28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN
(14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND
ANY FURTHER APPEAL.